1
2
3
4
5
6
7

ADAM B. WOLF (Bar No. 215914)
MELISA A. ROSADINI-KNOTT (Bar No. 316369)
PEIFFER WOLF CARR KANE CONWAY & WISE, LLP
3435 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90010
Telephone: (415) 766-3545
Facsimile: (415) 840-9435
Email: awolf@peifferwolf.com
         mrosadini@peifferwolf.com

*Attorneys for Plaintiffs I.J. and K.L.*

8

## UNITED STATES DISTRICT COURT

9

## NORTHERN DISTRICT OF CALIFORNIA

10

11
12
13
14
15
16
17
18
19
20
21

| | |
|---|---|
| I.J., an individual; and K.L., an individual,<br><br>          Plaintiffs,<br><br>          v.<br><br>THE COOPER COMPANIES, INC.;<br>COOPERSURGICAL, INC.; and DOES 1-<br>50, inclusive,<br><br>          Defendants. | Case No.<br><br>**COMPLAINT**<br>  1.  STRICT PRODUCTS LIABILITY—<br>      MANUFACTURING DEFECT<br>  2.  STRICT PRODUCTS LIABILITY—<br>      DESIGN DEFECT<br>  3.  STRICT PRODUCTS LIABILITY—<br>      FAILURE TO WARN<br>  4.  NEGLIGENCE<br>  5.  NEGLIGENT FAILURE TO RECALL<br>**DEMAND FOR JURY TRIAL** |

22
23
24
25
26
27
28

Plaintiffs I.J. and K.L. (collectively, "Plaintiffs") respectfully bring this Complaint against Defendants COOPERSURGICAL, INC. and THE COOPER COMPANIES, INC.; (collectively, "Cooper" or "Defendants"), and allege as follows:

**NATURE OF THE ACTION**

1. Defendants' defective product and negligent conduct destroyed Plaintiffs' precious and irreplaceable embryos.

2. Defendants manufactured, marketed, promoted, distributed, and/or sold media to be used for culturing and developing human embryos. Defendants marketed that their media provided "an optimized in vitro environment," which is necessary to ensure that fertilized human eggs can survive and develop into embryos viable for implantation.

3. Defendants further represented that they properly and adequately tested their embryo culture media before making the media available to the public, including to clinics who would use such embryo culture media for the storage of human embryos. They further claimed: "Our world class ISO 13485 and ISO 9001 certified manufacturing site consistently maintains the highest standards for product quality and reliability."

4. Despite these representations, Defendants did not sufficiently test the embryo culture media that they manufactured, marketed, promoted, distributed, and/or sold. As a result, they sold defective lots of embryo culture media, which turned out to be toxic to human embryos, eggs, and/or sperm.

5. Defendants' manufacturing, marketing, promoting, distributing, and/or selling its defective and toxic culture media resulted in the death of Plaintiffs' embryos.

6. Only after Plaintiffs' embryos died upon coming into contact with Defendants' defective embryo culture media did Defendants recall multiple lots of its culture media, including a lot that ruined Plaintiffs' embryos.

**PARTIES**

7. Plaintiff I.J. is a citizen of Canada. Plaintiff I.J. is not lawfully admitted for permanent residence in the United States nor is domiciled in the United States.

8.     Plaintiff K.L. is a citizen of Canada.  Plaintiff K.L. is not lawfully admitted for permanent residence in the United States nor is domiciled in the United States.

9.     Given the sensitive nature of their claims, Plaintiffs request this Court to grant a protective order pursuant to Federal Rule of Civil Procedure 26(c) to permit them to proceed under pseudonyms to ensure Defendants keep Plaintiffs' identity confidential throughout the pendency of the lawsuit and thereafter.[*]

10.    Defendant THE COOPER COMPANIES, INC. ("The Cooper Companies") is a global medical device corporation boasting worldwide revenues of $3.6 billion. It is a Delaware corporation with its principal place of business in the Northern District of California, specifically San Ramon, California. At all relevant times herein, Defendant THE COOPER COMPANIES, INC. is, and at all relevant times herein was, authorized to conduct business within the State of California, and distributed its products, including the above-referenced embryo culture media, within the State of California, including in the Northern District of California.

11.    Defendant COOPERSURGICAL, INC. ("CooperSurgical") is a wholly owned subsidiary of The Cooper Companies. COOPERSURGICAL, INC. is a Delaware corporation, with its principal place of business in Trumbull, Connecticut. Defendant primarily manufactures medical devices for women's healthcare and fertility markets. At all relevant times herein, Defendant CooperSurgical was and is authorized to conduct business within the State of California, and distributed its products, including the above-referenced embryo culture media, within the State of California, including within the Northern District of California.

12.    The Cooper Companies and CooperSurgical have worked quickly to solidify their primacy in the lucrative fields of reproductive and fertility healthcare, acquiring competitors to secure their place. In April 2018, CooperSurgical acquired LifeGlobal, a leading global provider of in vitro fertilization devices—including in vitro fertilization ("IVF") media—for $125 million dollars. In January 2021, it acquired Embryo Options, a company that provided streamlined case management and billing options for fertility clients. The following month, it acquired AEGEA

---

[*] Plaintiffs intend to file a motion for protective order, if requested by the Court or Defendant, to proceed under pseudonyms.

COMPLAINT AND DEMAND FOR JURY TRIAL

Medical, a California-based medical manufacturing company that creates devices used in reproductive medicine. In March 2021, it acquired Safe Obstetric Systems, another company that manufactures reproductive medical devices, for $52 million dollars.

13.   In November 2021, CooperSurgical acquired Generate Life Sciences, a purveyor of donor sperm and eggs, as well as other fertility services, for $1.6 billion. In February 2022, CooperSurgical acquired Cook Medical's reproductive health business for $875 million. This company produces medical devices for fertility, obstetrics, gynecology, IVF, and assisted reproductive technology ("ART").

14.   Following this significant consolidation of the fertility medical device industry, fertility clinicians have reported a decline in Defendants' product quality.

15.   Plaintiffs reserve the right, pursuant to Federal Rules of Civil Procedure 15, to seek leave to identify additional parties, whom Plaintiffs are currently unaware of, who are responsible for Plaintiffs' harm, as alleged herein.

16.   Plaintiffs are informed and believe, and on that basis allege, that at all times material hereto: Defendants were, actually or ostensibly, the agents, representatives, and/or employees of each and every other Defendant; Defendants were acting within the course and scope of said alternative personality, capacity, identity, agency, representation, and/or employment; Defendants were the trustees, partners, servants, joint venturers, shareholders, co-conspirators, contractors, and/or employees of each and every other Defendant; the acts and omissions alleged herein, while committed individually, were made by Defendants through such capacity, and within the scope of their authority, and with the permission and consent of each and every other Defendant, as to make Defendants jointly and severally liable to Plaintiffs for the acts and omissions alleged herein.

## JURISDICTION AND VENUE

17.   **Jurisdiction:** Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over the entire action by virtue of the fact that this is a civil action between citizens of the United States and citizens of a foreign state different states and wherein the matter in controversy exceeds $75,000, exclusive of interest and costs.

18.     This Court has personal jurisdiction over all Defendants.  Each Defendant is, and at all relevant times herein was, a citizen of and/or authorized to conduct business in the State of California and/or conducted such business within the State of California, including the Northern District of California and including the actions, dealings, and/or omissions that caused or contributed to the harm giving rise to this action.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant The Cooper Companies's principal place of business is within this District and is a resident of this District pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d).

20.     **Divisional Assignment:** Pursuant to Local Rule 3-2(c)-(d), this case is properly assigned to either the San Francisco Division or the Oakland Division, as a substantial part of the events or omissions giving rise to this action occurred in Contra Costa County.

## GENERAL FACTUAL ALLEGATIONS

### General Background of Assisted Reproductive Technology

21.     ART involves fertility-related treatments in which human eggs or embryos are manipulated.  The most common type of ART is IVF.

22.     During the IVF process, eggs are extracted from a woman and fertilized in a laboratory with sperm to create a viable embryo.  Later in the IVF process, the embryo is transplanted into a uterus.

23.     The process of extracting human eggs from a woman is lengthy, typically requiring significant medication, including injections, frequent bloodwork to monitor hormone levels, monitoring through ultrasound and other scans to check the development of the eggs, and performing a surgical procedure to collect the eggs.

24.     Following the collection of the eggs, sperm is mixed with the eggs in a laboratory to create embryos, and media is used to cultivate the embryos.

25.     Many people, including Plaintiffs, elect to have their embryos stored for a period of time before the embryo is transferred to a woman's uterus.

26.     There can be many reasons for undergoing these expensive and extensive procedures well in advance of the embryo implantation, including that human eggs are a limited

and precious resource.  A woman has a limited number of eggs at birth, and this supply diminishes as part of the natural aging process (commonly referred to as a "biological clock").  Moreover, not only does the quantity of a woman's eggs diminish with time, but so does a woman's egg quality, with miscarriages and chromosomal abnormalities occurring more frequently for women who are older at the time of a natural conception and pregnancy.  The most determinative factor in IVF success is the woman's age when her eggs were extracted.

### The Importance of Embryo Culture Media in IVF

27.     Embryo culture media plays a pivotal role in the IVF process. The culture media serves as the essential substance in which an egg is immersed, typically in a petri dish, when it is fertilized and during its development in the lab.

28.     Embryo culture media is composed of a salt solution with the addition of other components, such as magnesium, carbohydrates (pyruvate, lactate, and glucose), and amino acids.

29.     After egg retrieval, the embryologist fertilizes the eggs with sperm, and then the fertilized eggs develop to the blastocyst stage—typically, during a typical period of five to seven days when they are in the culture media.

30.     Embryologists closely monitor cell development during this time period to determine if the embryos are developing as intended. The count begins on "Day 0," or the day the eggs were fertilized with sperm. On Day 1, the embryologists typically assess the eggs to see which have successfully fertilized and become embryos. Between Day 1 and Day 3, the embryos typically begin cell division in the "cleavage stage." By Day 4, the embryos typically enter the "morula stage," characterized by a compacted mass of cells. By Day 5, the embryo typically re-expands to the blastocyst stage, in which the embryo shows two distinct groups of cells: an inner cell mass and an outer globe of cells.

31.     All embryo development is slightly different, and some embryos may develop later than others; but typically, fertilized eggs that do not develop to blastocyst by the seventh day are not considered viable. The embryo culture media in a petri dish supports and protects the developing embryos in these critical early stages, just as a woman's body would do during natural conception.

32.     The resulting embryos then can be transferred to the uterus, where a baby can form.

**Defendants' Embryo Culture Media**

33.     Defendants marketed and promoted their embryo culture media for use as the essential medium in which fertility clinics can fertilize eggs and create the embryos that would be the future children of fertility clients like Plaintiffs.

34.     Defendants further marketed and represented that their embryo culture media is subject to rigorous testing to ensure it is the highest quality embryo culture media available.

35.     Moreover, Defendants marketed and promoted that all their embryo culture media was properly tested, and thus that it could be relied upon and/or posed no harm in use with growing human embryos.

36.     Specifically, CooperSurgical claims "[q]uality is our cornerstone," stating its "products undergo thorough quality testing before being released, to ensure consistent quality for your piece of mind."

37.     Defendants manufactured, marketed, distributed, and/or sold their embryo culture media while promoting that their embryo culture media was tested by superior methods to ensure that the culture was not missing key ingredients and that no embryotoxic exposure occurred.

38.     Defendants knew that sterility and quality control are crucial to ensure that developing embryos in culture media are not harmed. Microbiological contamination or improperly created culture (*e.g.*, culture with missing ingredients) may kill the embryos it contacts.

39.     Microbiological contamination or improperly created culture (*e.g.*, culture with missing ingredients) can cause DNA fragmentation, non-viable embryos, poor-quality embryos, early pregnancy loss, preterm birth, birth defects, and/or predisposition to serious medical conditions.

40.     Microbiological contamination or improperly created culture (*e.g.*, culture with missing ingredients) can increase financial costs to both the patient and the clinics.

41.     Defendants knew or should have known that some of their embryo culture media was not properly and/or adequately manufactured, properly and/or adequately tested, and/or

7

properly and/or adequately inspected for contamination, and thus posed a severe risk to the human embryos that the culture media would contact.

**Defendants' Recall of Their Embryo Culture Media**

42.     On or about December 5, 2023, Defendants issued a recall of several lots of their embryo culture media, including LGGG Lots 231020-018741, 231020-018742, and 231020-018743 (the "Recalled Embryo Culture Lots.")

43.     However, on information and belief, Defendants intentionally did not immediately disseminate notice of the Recalled Lots publicly or throughout the IVF community.

44.     On information and belief, Defendants previously have manufactured and sold numerous products used in ART, including other culture media, that were defective and sometimes recalled.

**Defendants Knew or Should Have Known That the Recalled Embryo Culture Lots**
**Posed an Unreasonable Risk of Toxicity to Viable Embryos**

45.     As a manufacturer and distributor of numerous ART products, including culture media, Defendants knew that contaminated and/or improperly manufactured/assembled culture media could kill human embryos upon contact, have significant and adverse consequences for the survival outcome of embryos created through ART, and/or harm the children that result from those embryos. Accordingly, Defendants knew it was vitally important that their culture media was properly assembled, composed, tested and/or inspected prior to the distribution of such media.

46.     Despite this, Defendants failed to properly inspect, assemble, compose, and/or test its culture media, including the Recalled Embryo Culture Lots. Defendants knowingly put their culture media into the market when they knew or should have known that the Recalled Embryo Culture Lots posed a substantial and unacceptable risk to human embryos, including Plaintiffs' embryos.

47.     As a manufacturer of numerous products for use in ART, Defendants knew that people go to extraordinary lengths to obtain and use viable human embryos. Defendants knew that people place an extremely high value on their embryos, make substantial emotional and financial

investments for their embryos, and expect that great care will be taken to preserve and protect the embryos in order to avoid irreparable harm to their embryos.

48.     Defendants' conduct was despicable and was carried out by Defendants with a willful and conscious disregard of the rights and/or safety of others, including putting Defendants' profits over the safety of others, including Plaintiffs.  Defendants' conduct subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights.  Moreover, as discussed herein, Defendants' conduct amounted to a deceit and/or concealment of material fact(s) known to Defendants with the intention on the part of Defendants to deprive individuals of property and/or legal rights and/or otherwise cause injury.

## Plaintiffs' Embryos Were Destroyed By the Recalled Embryo Culture Lots

49.     Plaintiffs utilized ART to try to fulfill their dream of having biological children. To that end, Plaintiffs entrusted a fertility clinic to create their embryos in order to have a child.

50.     In 2023, Plaintiff I.J. underwent an egg-retrieval procedure that—to Plaintiffs' delight—yielded a collective total of twenty-four eggs.

51.     From those eggs, fourteen fertilized eggs were created using I.J.'s eggs and Plaintiff K.L.'s sperm.

52.     Plaintiffs' excitement was short-lived: None of their embryos made it to blastocyst; all of their embryos suddenly died.

53.     Plaintiffs' fertility doctor later told Plaintiffs that media from the Recalled Embryo Culture Lots was used, and was almost certainly the cause of the destruction of Plaintiffs' precious embryos.

54.     Plaintiffs are devastated. They may no longer be able to have children with their genetic material as a result of Defendants' conduct.

## FIRST CAUSE OF ACTION

## STRICT PRODUCTS LIABILITY—MANUFACTURING DEFECT

55.     Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

56.     At all times relevant herein, Defendants manufactured, distributed, and/or sold embryo culture media to be used with human embryos, including the Recalled Embryo Culture Lots.

57.     At the time the Recalled Embryo Culture Lots left Defendants' possession, the Recalled Embryo Culture Lots contained a manufacturing defect, such that they differed from Defendants' intended result.  This deviation included, but was not necessarily limited to, difference(s) in the chemical structure or composition of the Recalled Embryo Culture Lots and/or toxicity in the Recalled Embryo Culture Lots, such that the Recalled Embryo Culture Lots posed a fatal harm to human embryos upon their contact with human embryos, in addition to the other serious risks discussed in this Complaint.

58.     The embryo culture media from the Recalled Embryo Culture Lots was used as intended, and it came into contact with Plaintiffs' embryos, which resulted in the tragic destruction of Plaintiffs' embryos.

59.     The defect(s) in the culture media in the Recalled Embryo Culture Lots was a substantial factor in causing Plaintiffs' harm.

60.     Defendants acted with a conscious disregard for the safety of consumers and/or users of its Embryo Culture Media, including Plaintiffs, because, without limitation, Defendants were aware of the dangerous consequences of not properly or adequately testing their Embryo Culture Media Lots (including specifically the Recalled Embryo Culture Lots), when they knew or should have known the culture media (specifically, the Recalled Embryo Culture Lots) did not meet the product media specifications, were not safe, and posed a serious, toxic risk to irreplaceable human embryos, and failed to recall the Recalled Embryo Culture Lots before the media came into contact with Plaintiffs' embryos.

## SECOND CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY—DESIGN DEFECT

61.     Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

62.   Defendants designed, manufactured, distributed, and/or sold embryo culture media, including the Recalled Embryo Culture Lots, or caused such culture media to be designed, manufactured, and/or sold.

63.   The Recalled Embryo Culture Media Lots did not perform as safely or as effectively as an ordinary consumer would have expected it to perform when used or misused in a reasonably foreseeable manner.

64.   Defendants had actual or constructive notice and knew, or in the exercise of reasonable care and diligence should have known, that the Recalled Embryo Culture Lots were defective in their design as discussed herein, including but not limited to their composite materials, and likely would result in the irreversible damage and destruction of Plaintiffs' embryos.

65.   The benefits of the Recalled Embryo Culture Lots were and are not outweighed by their risks, particularly considering the potential harm resulting from their use on reproductive materials, including embryos; the likelihood of harm occurring; the feasibility of an alternative safer design at the time of manufacture; and the feasibility of more reliable testing methods and procedures.

66.   Defendants had actual or constructive notice and knew, or in the exercise of reasonable care should have known, that the Recalled Embryo Culture Lots had significant risks, were defective in design, as discussed herein, and had an unreasonable increased risk of damage or destruction to stored reproductive materials, including embryos, in addition to the other serious risks discussed in this Complaint.

67.   Plaintiffs were irreparably harmed because the Recalled Embryo Culture Lots were toxic and/or contained materials that were toxic when coming into contact with human embryos, eggs, and/or other genetic material, such as those belonging to Plaintiffs.

68.   As a direct and proximate result of the defective designs of the Recalled Embryo Culture Lots, Plaintiffs were harmed as described herein, including but not limited to the destruction of their embryos.

69.   The failure of the Recalled Embryo Culture Lots to perform safely and effectively was a substantial factor in causing Plaintiffs' harm and damages.

70.     Defendants acted with a conscious disregard for the safety of consumers and/or users of its Embryo Culture Media, including Plaintiffs, because, without limitation, Defendants were aware of the dangerous consequences of not properly or adequately testing or inspecting their Embryo Culture Media (including specifically the Recalled Embryo Culture Lots), when they knew or should have known the culture media (specifically, the Recalled Embryo Culture Lots) was not safe and posed a serious, toxic risk to irreplaceable human embryos, and failed to recall the Recalled Embryo Culture Media Lots before the media came into contact with Plaintiffs' embryos.

### THIRD CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY—FAILURE TO WARN

71.     Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

72.     Defendants designed, manufactured, distributed, and/or sold embryo culture media to be used with human embryos, including the Recalled Embryo Culture Lots, and/or caused such culture media to be designed, manufactured, distributed, and/or sold.

73.     The Recalled Embryo Culture Lots had risks, including but not limited to embryotoxicity, that were known and/or knowable in light of the generally accepted scientific knowledge at the time of manufacture, distribution and/or sale.

74.     The risks of contaminated or defective culture medium, including the Recalled Embryo Culture Lots, presented a substantial and unreasonable danger, including but not limited to embryotoxicity and destruction of viable embryos, when such medium was used as intended and/or in a reasonably foreseeable manner.

75.     Despite their awareness that their culture media, including the Recalled Embryo Culture Lots, were defective and contained an unacceptably increased danger to embryos, Defendants failed to warn consumers, including but not limited to Plaintiffs and Plaintiffs' fertility providers who purchased the culture media, that the media had not been properly and/or sufficiently tested or inspected, contained compounds and/or a combination of compounds that were toxic and/or harmful to human embryos, and/or had an increased risk of embryotoxicity or adverse growth and development, in addition to the other serious risks discussed in this Complaint..

76.     Neither Plaintiffs nor their fertility providers knew or would have known or recognized the risks of the Recalled Embryo Culture Lots when they were used.

77.     As a direct and proximate result of Defendants' failure to adequately warn of the dangerous and embryotoxic effects of the Recalled Embryo Culture Lots, Plaintiffs were harmed as described herein, including but not limited to the destruction of their embryos.

78.     The lack of sufficient warnings was a substantial factor in causing Plaintiffs' harm and damages. Contaminated or harmful embryo culture media would not have been used with Plaintiffs' embryos if Defendants had provided sufficient warning(s) in advance.

79.     Defendants acted with a conscious disregard for the safety of consumers and/or users of its Embryo Culture Media, including Plaintiffs, because, without limitation, Defendants were aware of the dangerous consequences of not properly or adequately testing or inspecting their Embryo Culture Media (including specifically the Recalled Embryo Culture Lots), when they knew or should have known the culture media (specifically, the Recalled Embryo Culture Lots) were not safe and posed a serious, toxic risk to irreplaceable human embryos, eggs, and genetic material, and failed to recall or otherwise remove from the market the Recalled Embryo Culture Lots before the media came into contact with Plaintiffs' embryos.

## FOURTH CAUSE OF ACTION

### NEGLIGENCE

80.     Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

81.     Defendants designed, manufactured, distributed, and/or sold embryo culture media for use with human embryos, including the Recalled Embryo Culture Lots, or caused such media to be designed, manufactured, and/or sold.

82.     As a manufacturer of culture media for use with human embryos, Defendants owed duties, including but not limited to Plaintiffs, to design, manufacture, inspect, compose, and/or test its culture media, including the Recalled Embryo Culture Lots, such that their media were not toxic or hazardous when used on human embryos and/or did not contain toxic or contaminated materials and/or was not missing materials.

13

83.    Defendants breached these duties and were negligent in their design, manufacture, inspection, composition, and/or testing of their culture media, including the Recalled Embryo Culture Lots.

84.    As a direct and proximate result of Defendants' negligent acts and/or omissions, including but not limited to their failure to properly or adequately test their culture media (including the Recalled Embryo Culture Lots), as well as promoting and marketing their culture media as superior, effective, properly tested, and safe for use on human embryos despite their knowledge of the contamination, defective design, defective manufacture, and/or failure(s) to adequately warn of the dangerous and embryotoxic or otherwise harmful effects of the Recalled Embryo Culture Lots, Plaintiffs were harmed as described herein, including but not limited to the destruction of their embryos.

85.    These negligent acts and/or omissions were a substantial factor in causing Plaintiffs' harm and damages.

86.    Defendants acted with a conscious disregard for the safety of consumers and/or users of its Embryo Culture Media, including Plaintiffs, because, without limitation, Defendants were aware of the dangerous consequences of not properly or adequately testing or inspecting their Embryo Culture Media (including specifically the Recalled Embryo Culture Lots), when they knew or should have known the culture media (specifically, the Recalled Embryo Culture Lots) were not safe and posed a serious, toxic risk to irreplaceable human embryos, eggs, and genetic material, and failed to recall or otherwise remove from the market the Recalled Embryo Culture Lots before the media came into contact with Plaintiffs' embryos.

## FIFTH CAUSE OF ACTION

### NEGLIGENT FAILURE TO RECALL

87.    Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

88.    At all times relevant herein, Defendants manufactured, distributed, and/or sold culture media for use with human embryos, including the Recalled Embryo Culture Media Lots.

89.     As manufacturers, designers, and distributors of culture media for use with human embryos, Defendants owed duties, including but not limited to Plaintiffs, to design, manufacture, inspect, compose, and/or test their culture media, including the Recalled Embryo Culture Lots, such that their culture media was not toxic or hazardous when used on human embryos, did not contain toxic or contaminated materials, and was not missing component materials such that the media were harmful or destructive.  Further, Defendants had an ongoing duty following their manufacture, distribution, and/or sale of its culture media, including the Recalled Embryo Culture Lots, to inform purchasers, consumers, and/or others who used their culture media that the media were toxic and/or hazardous and/or contained toxic or contaminated materials or composite components harmful to human embryos, and to immediately recall and/or remove such media from the market to prevent harm.

90.     Defendants breached these duties and acted negligently by failing to recall the Recalled Embryo Culture Media Lots earlier, including before such culture medium came into contact with Plaintiffs' embryos.

91.     For a significant period of time before it issued the recall of their Recalled Embryo Culture Lots, Defendants knew and/or should have known that, when used as intended, their Recalled Embryo Culture Media Lots were not properly or adequately composed or assembled, nor were they properly or adequately tested prior to distribution, and posed an unreasonable increased risk to embryos, in addition to the other risks noted in this Complaint.

92.     Defendants knew, and/or reasonably should have known that the defects in their culture media, including the Recalled Embryo Culture Lots, posed a substantial risk of serious injury to the embryos in which the media came into contact with and/or was used.

93.     Defendants knew and/or reasonably should have known that they had failed to properly or adequately test, inspect or assemble the composite materials in their Recalled Embryo Culture Lots before distributing and/or selling and/or causing such culture media from entering the market.

94.     A reasonable manufacturer, designer, distributor, and/or seller in the same or similar circumstances would have recalled the Embryo Culture Media and issued a notice to purchasers,

consumers, and/or users—prior to the media coming into contact with Plaintiffs' embryos—rather than continuing to allow the media to be used, sold, distributed, and/or manufactured, thereby obfuscating the true risks of their culture media, specifically the Recalled Embryo Culture Lots, to human embryos.

95.     Despite the fact that it knew or should have known that the Recalled Embryo Culture Lots were defective, toxic, and posed an unacceptable risk of toxicity to embryos, Defendants failed to recall their culture media in a timely or prudent manner.

96.     Defendants acted with a conscious disregard for the safety of consumers and/or users of its Embryo Culture Media, including Plaintiffs, because, without limitation, Defendants were aware of the dangerous consequences of not properly or adequately testing or inspecting its Embryo Culture Media (including specifically the Recalled Embryo Culture Lots), when they knew or should have known the culture media (specifically, the Recalled Embryo Culture Lots) were not safe and posed a serious, toxic risk to irreplaceable human embryos, eggs, and genetic material, in addition to the other risks discussed in this Complaint, and failed to recall or otherwise remove from the market the Recalled Embryo Culture Lots before the media came into contact with Plaintiffs' embryos.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

1) For past, present, and future non-economic damages in an amount to be determined at the time of trial;

2) For past, present, and future economic damages in an amount to be determined at the time of trial;

3) For exemplary damages, in an amount to be determined at trial;

4) For costs of suit herein;

5) For pre- and post-judgement interest as allowed by law; and

///

///

///

COMPLAINT AND DEMAND FOR JURY TRIAL

1    6) For such other and further relief as the Court may deem just and proper.

2

3    DATED:  January 16, 2024          PEIFFER WOLF CARR KANE CONWAY & WISE, LLP

4

5

6                    By:       */s/ Adam. B. Wolf*

7                         ADAM B. WOLF
                         MELISA A. ROSADINI-KNOTT

8

9                         *Attorneys for Plaintiffs*

10

11

12               **<u>DEMAND FOR JURY TRIAL</u>**

13    Plaintiffs hereby demand a trial by jury on all claims so triable.

14

15    DATED:  January 16, 2024          PEIFFER WOLF CARR KANE CONWAY & WISE, LLP

16

17

18                    By:       */s/ Adam. B. Wolf*

19                         ADAM B. WOLF
                         MELISA A. ROSADINI-KNOTT

20

21                         *Attorneys for Plaintiffs*

22

23

24

25

26

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL